**STATE OF ALABAMA et al. v. UNITED STATES et al.**

**STATE OF TENNESSEE et al. v. SAME.**

**COMMONWEALTH OF KENTUCKY et al. v. UNITED STATES.**

Nos. 706–708.

District Court, W. D. Kentucky, Louisville Division.

Aug. 3, 1944.

Wm. N. McQueen, Acting Atty. Gen., and Forman Smith, Asst. Atty. Gen., for State of Alabama and Alabama Public Service Commission.

Leon Jourolmon, Jr., of Knoxville, Tenn., for State of Tennessee and the Railroad and Public Utilities Commission of State of Tennessee.

Eldon S. Dummitt, Atty. Gen., M. B. Holifield, Asst. Atty. Gen., and J. E. Marks, of Lexington, Ky., for Commonwealth of Kentucky and Railroad Commission of Kentucky.

Daniel W. Knowlton, Chief Counsel and Allen Crenshaw, Atty., both of Washington, D. C., for Interstate Commerce Commission.

W. L. Grubbs, of Louisville, Ky., E. A. Smith, of Chicago, Ill., Charles Clark and Jos. P. Cook, both of Washington, D. C., Y. D. Lott, of Mobile, Ala., and H. L. Walker and Frank W. Gwathmey, both of Washington, D. C., for intervening railroads.

Richard H. Field, Gen. Counsel, David F. Cavers, Asst. Gen. Counsel, and Bernard M. Fitzgerald, Transportation Counsel, all of Washington, D. C., and M. D. Miller, of Jennings, La., for Economic Stabilization Director and the Price Administrator.

Eli H. Brown, III, U. S. Dist. Atty., of Louisville, Ky., and Robert L. Pierce, Sp. Asst. to Atty. Gen., for the United States.

Before HAMILTON, Circuit Judge, and SWINFORD and MILLER, District Judges.

MILLER, District Judge.

The State of Alabama, the State of Tennessee, and the Commonwealth of Kentucky filed these respective actions on June 12, 1944, against the United States of America and the Interstate Commerce

Commission, to enjoin and set aside an order entered by the Interstate Commerce Commission on May 8, 1944, which required the railroads operating in those three states to establish on or before July 1, 1944, certain minimum intrastate fares for transportation of persons in railway coaches which would raise said intrastate fares in the respective states to the level of corresponding interstate fares contemporaneously maintained by the railroads to, from and through such states. The Interstate Commerce Commission has postponed the effective date of its order to August 15, 1944, to provide a reasonable opportunity for a hearing and consideration by the Court of the issues presented. In compliance with the provisions of 28 U.S.C.A. § 47 a three-judge court was duly convened, which after consolidating the three actions by agreement of the parties held the prescribed hearing. The matter is submitted for final judgment.

For many years prior to 1936 the basic interstate passenger coach fare of Class 1 American railroads was 3.6 cents per passenger mile. However, during the period of from December 1, 1933, through November 14, 1937, most of the railroads operating in the territory south of the Ohio and Potomac Rivers and east of the Mississippi River published and maintained an interstate passenger coach fare of 1.5 cents per passenger mile for one-way trips, and a 10% lower fare or 1.35 cents per passenger mile for round-trips. During this same period other southern railroads maintained an interstate passenger coach fare of 2 cents per passenger mile. In a proceeding known as Docket No. 26550, Passenger Fares and Surcharges, decided February 28, 1936, and reported in 214 I.C.C. 174, the Interstate Commerce Commission found that the basic fare of 3.6 cents per passenger mile on interstate passenger coach travel was unreasonable to the extent that it exceeded 2 cents per passenger mile. In the same proceeding the Commission found that the interstate coach fare then being maintained and charged by some of the southern railroads, of 1.5 cents one-way and 1.35 cents round-trip, was not unreasonable. Pursuant to the findings in that proceeding the basic interstate coach fare was reduced from 3.6 cents to 2 cents per passenger mile on June 1, 1936. In a proceeding known as Ex parte No. 148, Increased Railway Rates, Fares, and Charges, 1942, 248 I.C.C. 545, the Commission by order of January 21, 1942, authorized an increase of 10% in the interstate passenger coach fares effective February 10, 1942, thus raising the interstate passenger coach fare to 2.2 cents per passenger mile This increase was for the purpose of taking care of increased expenses of the railroads incident to the war period and was limited to the duration of the war and six months thereafter. The southern railroads which had been charging since December 1935 interstate passenger coach fares of 1.5 cents one-way and 1.35 cents round-trip increased these fares on November 15, 1937, to 2 cents one-way and 1.8 cents round-trip, and on January 15, 1939, again reduced said fares to 1.5 cents one-way and 1.35 cents round-trip. Pursuant to the order in Ex parte No. 148 Increased Railway Rates, Fares, and Charges, 248 I.C.C. 545, these railroads on February 10, 1942, increased the fares 10%, which made them 1.65 cents one-way and 1.485 cents round-trip. On October 1, 1942, these fares were again increased to 2.2 cents one-way and 1.98 cents round-trip, which fares are still in effect.

Shortly after October 1, 1942, when the railroads increased their interstate passenger fares to 2.2 cents per mile, they filed with the Public Service Commission of Alabama, the Railroad and Public Utilities Commission of Tennessee and the Railroad Commission of Kentucky certain tariff schedules to become effective December 1, 1942, designed to raise the intrastate passenger coach fares in the respective states to the level of the corresponding interstate fares. Each State Commission held an investigation and hearing. The Public Service Commission of Alabama found that the railroads had failed to show that they needed any additional revenue, that on the contrary they had ample revenue to take care of their operating expenses and in addition earn a reasonable return on their investments, and that the difference between interstate and intrastate fares did not create any unreasonable discrimination or undue prejudice. The Railroad and Public Utilities Commission of Tennessee found that the carriers had presented no evidence which would justify the increase sought by them and ordered that the existing fares be maintained as just and reasonable. The Railroad Commission of Kentucky found that the proposed increases in coach fares within that state were not shown by the evidence to be just and reasonable, and that while the uniformity sought by the railroads between the interstate and intrastate fares was desirable, uniformity alone was

not a sufficient justification for the substantial increases proposed in the coach fares. The proposed increases were denied in each instance.

On March 17, 1943, the railroads operating in Alabama filed with the Interstate Commerce Commission a petition seeking an investigation under Sections 3, 13 and 15 of the Interstate Commerce Act, 49 U. S.C.A. §§ 3, 13, 15, of intrastate passenger coach fares in Alabama. On June 24, 1943, the Kentucky railroads instituted similar proceedings before the Interstate Commerce Commission for authority to permit increases in Kentucky intrastate passenger coach fares, and at approximately that time the Tennessee railroads also instituted such proceedings with respect to the intrastate coach fares in Tennessee. The Alabama, Kentucky and Tennessee proceedings were docketed respectively as No. 28963, No. 29000, and No. 29037. The railroads operating in North Carolina filed similar proceedings which were docketed under No. 29036, but the ruling hereinafter referred to with respect to the rates in North Carolina is not involved in the three cases now before this Court. The Interstate Commerce Commission consolidated all of the proceedings before it. After taking evidence and holding hearings the Commission on March 25, 1944, issued its report and findings under the style and docket number of Alabama Intrastate Fares No. 28963. Specific findings were made as follows:

"1. The interstate one-way and round-trip coach fares now in effect to, from, and through points in Alabama, Kentucky, North Carolina and Tennessee, and the interstate round-trip fares applicable in sleeping and parlor cars now in effect to, from, and through points in Alabama and Tennessee, are just and reasonable.

"2. The intrastate one-way and round-trip coach fares in Alabama, Kentucky, North Carolina, and Tennessee, with certain exceptions hereinbefore referred to and not here in issue, and the intrastate round-trip fares applicable in sleeping and parlor cars in Alabama and Tennessee, are lower than the corresponding fares aplicable interstate and intrastate generally throughout southern territory, except in the several States mentioned in this finding.

"3. The conditions affecting the one-way and round-trip transportation of passengers in coaches within these four States, and the round-trip transportation of passengers in sleeping and parlor cars within Alabama and Tennessee, intrastate on the one hand, and interstate to, from, and through those respective States on the other, are substantially similar.

"4. Interstate passengers in these States travel in the same train and generally in the same cars with intrastate passengers, but are forced to pay higher fares than the intrastate passengers for like services, to the undue and unreasonable advantage and preference of the intrastate passengers and the undue and unreasonable disadvantage and prejudice of the interstate passengers.

"5. Respondents' revenues under the lower intrastate fares are less by at least $725,000 per annum in Alabama, $500,000 in Kentucky, $525,000 in North Carolina, and $525,000 in Tennessee than they would be if those fares were increased to the level of the corresponding interstate fares, and traffic moving under these lower intrastate fares is not contributing its fair share of the revenues required to enable respondents to render adequate and efficient transportation service.

"6. The maintenance of intrastate one-way and round-trip coach fares in Alabama, Kentucky, North Carolina, and Tennessee, and of intrastate round-trip fares applicable in sleeping and parlor cars in Alabama and Tennessee, to the extent that such fares are on a lower level than the corresponding interstate fares, causes and will cause undue and unreasonable advantage to and preference of persons in intrastate commerce, undue and unreasonable disadvantage to and prejudice against persons in interstate commerce, and undue, unreasonable, and unjust discrimination against interstate commerce; and this unlawfulness should be removed by increasing the aforesaid intrastate fares in the respective States to the level of the corresponding interstate fares contemporaneously maintained by respondents to, from, and through such States; provided, that the aggregate charge made by any of the respondents for the intrastate transportation in any of the States shall not exceed the aggregate charge made for like accommodations and for a like distance by the same respondent for interstate transportation to, from, or through such State.

"The foregoing findings are without prejudice to the right of the authorities of the affected States, or of any interested party,

to apply for modification thereof as to any specific intrastate fare on the ground that such fare is not related to interstate fares in such a way as to contravene the provisions of the Interstate Commerce Act."

The Commission made no order at that time but stated:

"In accordance with our practice in such proceedings, we shall leave to respondents and the respective State Commissions the matter of adjusting the intrastate fares to conform to these findings. If this is not accomplished within 30 days from the service of this report, consideration will be given to the entry of an appropriate order."

The State Commissions of Alabama, Tennessee and Kentucky promptly filed applications for reconsideration which were denied by the Interstate Commerce Commission, following which a final corrected order was entered in said proceedings dated May 8, 1944. By this order the railroads operating in Alabama, Tennessee and Kentucky were ordered to cease and desist on or before July 1, 1944, "from practicing the undue prejudice and preference and the unjust discrimination found in said report to exist * * * and thereafter to maintain and apply passenger fares for intrastate transportation in the respective states which shall be on bases no lower than the passenger fares presently maintained and applied by the respective respondents for like accommodations in interstate transportation to, from, and through the respective States; provided, that the resulting aggregate charge made by any of said respondents for intrastate transportation in any of the states shall not exceed the aggregate charge made for like accommodations and for a like distance by the same respondents in interstate transportation to, from, or through such State." The three State Commissions thereafter filed these three actions in the United States District Court for the Western District of Kentucky, stating in each instance that the Louisville & Nashville Railroad Company, one of the carriers which filed the petitions before the Interstate Commerce Commission, is a Kentucky corporation with its residence and principal office in said Federal Judicial District. The complaints after stating the foregoing facts in detail allege that the corrected order of the Interstate Commerce Commission of May 8, 1944, constitutes an unwarranted and unjustified invasion of the sovereignty of the State in that it exceeds the powers granted to the Federal Congress by the Commerce Clause of Section 8 of Article 1 of the Constitution of the United States; that said order contravenes the Fifth and Tenth Amendments of said Constitution; that there was no evidence before the Commission to support the report, findings and order made by it; that the corrected order of May 8, 1944, is in contravention of the stabilization program of the Federal Government as embodied in the Emergency Price Control Act of 1942 and its Amendment of October 2, 1942, 50 U.S.C.A.Appendix, § 901 et seq.; and that unless said order is set aside and annulled innumerable citizens in the respective states will suffer irreparable injury and damage in the form of excessive passenger fares in intrastate transportation and the respective State commissions will be deprived of their right to regulate intrastate commerce and intrastate passenger fares on railroads operating in said States. Fred M. Vinson, Director of the Office of Economic Stabilization, through Chester Bowles, Price Administrator of the Office of Price Administration, moved to file, and was permitted to do so, an intervening petition in which he attacks the corrected order of May 8, 1944, as being invalid by reason of its failure properly to interpret and apply its constitutional and statutory authority to protect interstate commerce from undue and unreasonable burdens from intrastate commerce and also by its failure to accommodate the exercise of its powers to the congressional policies embodied in the Emergency Price Control Act of 1942 and the Stabilization Act of October 2, 1942. The Interstate Commerce Commission by its answers alleges that the proceedings, report and orders herein involved indirectly and collaterally related to previous consideration, decisions, and orders of the Commission in respect to the determination of reasonable passenger fares in interstate commerce particularly with reference to such fares in southern passenger association territory, generally located east of the Mississippi River and south of the Ohio and Potomac Rivers, such consideration and decisions covering a period of many years prior to the report involved in this action; that its findings and conclusions in its report of March 25, 1944, were fully supported and justified by the evidence submitted; and that the order of May 8, 1944, was not entered either arbitrarily or unjustly or without evidence to support it and was

within the authority conferred upon the Commission by law. The railroads' motions to intervene were sustained and they filed intervening answers adopting the answer filed on behalf of the Interstate Commerce Commission. The United States of America filed an answer pointing out that the proceedings presented a situation where one Government agency was opposing another Government agency, and in view of the fact that both Government agencies would have an opportunity to present their respective positions by their own counsel it would take a neutral position without prejudice to its later support of one or the other agency in any appeal that might be taken from the decree of the Court.

Jurisdiction of the District Court is conferred by Section 41 (28) Title 28 United States Code Annotated. The venue of the present suits in the United States District Court for the Western District of Kentucky is provided by Section 43, Title 28 United States Code Annotated. The procedure herein followed is provided in Sections 44 through 48, Title 28 United States Code Annotated.

■■■ Section 15 of the Interstate Commerce Act, Section 15, Title 49 United States Code Annotated, empowers the Interstate Commerce Commission to make investigation and hold hearings following any complaint by an authorized party as to the reasonableness of any existing rate. If, following such investigation and hearing, the Commission is of the opinion that the rate is unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, it is authorized and empowered to determine and prescribe what will be the just and reasonable rate to be thereafter observed in such case. Section 13 of the Act, Section 13, Title 49 United States Code Annotated, authorizes any person, firm or corporation, or any common carrier or any State Railway Commission to make complaint to the Commission and have an investigation by the Commission of the matters complained of. It also authorizes the Commission to institute such an inquiry at any time on its own motion. Subsection 4 of Section 13 provides that whenever in any such investigation the Commission finds that any rate causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate commerce on the other hand, or any un-

due, unreasonable or unjust discrimination against interstate commerce, which is declared to be unlawful by the Act, it shall prescribe the rate thereafter to be charged in such manner as in its judgment will remove such advantage, preference, prejudice or discrimination, and that such rate shall be observed by the carrier, *the law of any State or the decision or order of any State authority to the contrary notwithstanding.* The State Commissions recognize the constitutionality of this legislation, which has been many times upheld, but they contend, and rightly so, that the power of the Commission to fix intrastate rates is limited to the two situations of (1) where the evidence shows a preference as between persons or localities in intrastate commerce on the one hand and interstate commerce on the other hand, and (2) where the evidence shows any unreasonable or unjust discrimination against interstate commerce. Any attempt on the part of the Interstate Commerce Commission to regulate intrastate rates where one of these two situations does not exist would be in conflict with the Tenth Amendment to the United States Constitution. Section 15 of the Interstate Commerce Act imposed an affirmative duty on the Interstate Commerce Commission to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States. Intrastate rates constitute a very important part in maintaining such an adequate national railway system. Gross revenue from intrastate transportation is a little less than one-third of the gross revenue from interstate transportation. If intrastate rates are fixed at a substantial lower level than interstate rates, the share which intrastate traffic will contribute will be proportionately less. If the railways are to earn a fixed net percentage of income, the lower the intrastate rates, the higher the interstate rates will have to be. The effective operation of the Act justly requires that intrastate traffic should pay a fair proportionate share of the cost of maintaining an adequate railway system. The Supreme Court has on numerous occasions recognized this dovetail relation between the purpose of Section 15 of the Act and the authority of the Commission under Section 13(4) of the Act to remove undue or unjust discrimination against interstate commerce. Accordingly, when that purpose is interfered with by a disparity of intrastate rates the Commission is author-

ized to end the disparity by a proper adjustment of the intrastate rates in question. Railroad Commission v. Chicago, Burlington and Quincy Railroad Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086; State of New York v. United States, 257 U.S. 591, 42 S.Ct. 239, 66 L.Ed. 385; Houston, E. & W. T. R. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341; State of Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077; United States v. Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181. Accordingly, the Interstate Commerce Commission was fully authorized and empowered to order the adjustment of purely intrastate rates in Alabama, Tennessee and Kentucky if the evidence introduced in the investigation and hearing proved the existence of either of the two situations above referred to.

■ In these proceedings it is not the province of the Court to review the evidence before the Commission for the purpose of making its own findings of fact. It is a well settled rule of administrative law that the functions of a reviewing court are limited to deciding whether or not there was sufficient evidence to support the findings of fact of the administrative board and whether or not the correct rule of law was applied to the facts so found. Although reasonable persons may differ with the findings of fact by the administrative board upon the evidence before it, yet if it appears from the record that such findings are supported by substantial evidence the law makes the board's findings on such facts conclusive. Interstate Commerce Commission et al. v. Jersey City et al., 64 S.Ct. 1129; Helvering v. National Grocery Company, 304 U.S. 282, 294, 58 S. Ct. 932, 82 L.Ed. 1346; St. Joseph Stock Yards Company v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 80 L.Ed. 1033; State of Ohio v. United States, 292 U.S. 498, 506, 54 S.Ct. 792, 78 L.Ed. 1388; Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L. Ed. 308. It naturally follows that if the administrative board applied the correct rule of law to the facts so found, its final order in the case must be affirmed. Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037; Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343; Virginian R. Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463.

■ The validity of the Commission's order of May 8, 1944, rests primarily upon the basic fact that interstate coach fares to, from and through the three states in question are just and reasonable. Unless that fact is first established there is no basis for a finding of discrimination against interstate commerce. Georgia Public Service Commission v. United States, 283 U.S. 765, 51 S.Ct. 619, 75 L.Ed. 1397; United States v. Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181. The Commission so found in its first finding of fact. We review the record merely to determine if that finding is supported by substantial evidence. The Commission had before it evidence showing the history of both interstate and intrastate fares and the statistical data with respect to the principal railroads operating in Alabama, Tennessee and Kentucky. It had but recently completed a very extensive investigation of freight rates and passenger fares throughout the country in a proceeding before it docketed as Increased Railway Rates, Fares and Charges, 1942, 248 I.C.C. 545, commonly referred to as Ex parte No. 148. On January 21, 1942, it entered a preliminary order in that proceeding authorizing a general increase of 10% in passenger fares as proposed by the carriers, finding as it did so that the increase in fares proposed was necessary to enable the carriers to continue to render adequate and efficient railway transportation service during the present emergency, and that the evidence before it showed that the proposed increased fares were reasonable. This finding was renewed and affirmed in the later report of March 2, 1942. On January 4, 1943, the proceeding was reopened for further hearing in response to petitions filed by the Office of Price Administration, various state regulatory bodies and others, who claimed that the financial condition of the railroads had so improved since the original decision, chiefly by subsequent increase in the volume of traffic, as to render unnecessary the continuance of the increase previously authorized. Some of these protestants also claimed that the increases were inflationary in effect, and incompatible with the principles of the economic policy adopted by Congress to prevent inflation. Following the hearing of further evidence in that proceeding in February 1943, which included the latest available report of railroad earnings, as well as forecasts made by a witness of the Office of

Price Administration respecting anticipated earnings for the entire year of 1943, the Commission suspended until January 1, 1944, the increases in freight charges previously authorized, and also cancelled the increases authorized by transportation commutation fares, but declined to modify the previous increases in passenger fares. In its report of April 6, 1943, 255 I.C.C. 357, it pointed out that the evidence showed that passenger traffic had failed for many successive years to pay its proper share of railway expenses, and that only with the large volume of traffic and passenger revenue was the 1942 passenger deficit currently eliminated. It found that under then existing conditions the revenues received by the railroads for the remainder of 1943, if their freight rates and charges were so reduced, would meet the objectives of the national transportation policy as defined in the Interstate Commerce Act. On October 11, 1943, the Commission denied petitions filed by the Office of Price Administration and the Alabama and North Carolina Commissions seeking a further investigation of interstate passenger fares in the South. In a 3rd report in Ex Parte No. 148, 256 I.C.C. 502, dated November 8, 1943, and also in a 4th report in the same proceeding dated May 8, 1944, the suspension of freight rate increases was further successively extended to June 30, 1944 and then to December 31, 1944, but the increase in passenger coach fares was allowed to stand. The Commission in making its order of May 8, 1944, had this previous investigation before it and was not required for the purpose of making a finding in the three proceedings then pending before it to retrace or duplicate this work just recently and carefully completed. Administrative procedure necessarily results in the existence of a gap between the time when the record evidence is closed and the time the administrative decision is later promulgated, which makes it possible and permissible for the Commission, in its discretion, to review or supplement its findings by consideration of evidence subsequently developing instead of rehearing the matter in its entirety. Illinois Commerce Commission v. United States, 292 U.S. 474, 480, 481, 54 S.Ct. 783, 78 L.Ed. 1371; Interstate Commerce Commission et al. v. Jersey City et al., 64 S.Ct. 1129. No doubt the Commission, if necessary, could have taken judicial notice of all of its previous rulings just referred to. Butler v. Eaton, 141 U.S. 240, 11 S.Ct. 985, 35 L.Ed. 713;

Freshman v. Atkins, 269 U.S. 121, 46 S.Ct. 41, 70 L.Ed. 193; National Fire Insurance Co. v. Thompson, 281 U.S. 331, 336, 50 S.Ct. 288, 74 L.Ed. 881; Kelly v. Johnston, 9 Cir., 111 F.2d 613, 615. But in any event such evidence was admissible in the administrative hearing, which is not bound by the strict and technical rules of evidence prevailing in common law trials. It appears well settled that an administrative board has a much broader consideration of facts having a material bearing upon the issue presented than has a jury. Opp Cotton Mills v. Administrator, 312 U.S. 126, 154, 155, 657, 61 S.Ct. 524, 85 L.Ed. 624; Spiller v. Atchison, T. & S. F. R. Co., 253 U.S. 117, 40 S.Ct. 466, 64 L.Ed. 810; Interstate Commerce Commission v. Baird, 194 U.S. 25, 24 S.Ct. 563, 48 L.Ed. 860; United States v. Interstate Commerce Commission, 53 App.D.C. 289, 290 F. 264; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; Wigmore on Evidence, 3rd Ed., Sections 4a and 4b and 4c (26 at Page 70). These previous investigations and conclusions were supplemented with current statistical data and evidence of increased operating costs largely attributable to war-time conditions. It is true that the same war-time conditions have greatly increased the revenues of the carriers, but it has been with resulting unusual wear and tear on equipment. The question presented was a complex one involving new and changing factors of indefinite duration. "The process of rate making is essentially empiric. The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems." Board of Trade v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432. In our opinion the evidence was sufficient to sustain this finding of the Commission.

The 2nd and 5th findings of the Commission appear not to be seriously contested by the petitioners, and in any event are fully sustained by the evidence.

The 3rd and 4th findings of the Commission to the effect that the conditions affecting intrastate transportation in the three states on the one hand, and interstate transportation to, from and through those respective states on the other hand, are

substantially similar, and that interstate passengers in these states travel in the same trains and generally in the same cars with the intrastate passengers, but are forced to pay higher fares than the intrastate passengers for the like service, are contested by the petitioners, but a review of the record discloses substantial evidence to support these findings. It is conceded by the railroads that the streamlined de luxe trains offer to the traveling public a much higher standard of service than other regular trains or so-called local trains, but in the great majority of cases the streamlined or de luxe trains are available to and actually carry both interstate passengers and intrastate passengers. In a few instances their schedules do not provide for but one regular stop within a state, which prevents the transportation of intrastate passengers within that state, but such a schedule is apparently necessary in order to provide that type of service, and considering both that fact and the relative insignificance of this type of transportation it can be largely disregarded in making the general findings referred to. That part of finding No. 4 which states that the payment by interstate passengers of a higher fare than is paid by the intrastate passengers is to the undue and unreasonable disadvantage and prejudice of the interstate passengers may or may not be sufficiently supported by the evidence to justify its finding, but in view of finding No. 6, hereinbelow referred to, it becomes unnecessary to decide that point.

■ The Commission found as finding No. 6 that the maintenance of the existing lower intrastate coach fares in Alabama, Tennessee, and Kentucky causes undue, unreasonable and unjust discrimination against interstate commerce, which should be removed by increasing intrastate fares in respective states to the level of the corresponding interstate fare to, from and through such states. The evidence showed that the disparity in rates causes the railroads' revenues to be substantially less than they would be if the intrastate fares were increased to the interstate fare level, and that this disparity is such that passengers destined to points outside the respective states were encouraged to purchase intrastate tickets to points near the state line and then either buy tickets or pay cash for the remainder of the journey, thus using the lower intrastate fare to defeat the higher interstate fare. The two classes of traffic are inextricably intermingled;

the same railways and the same cars carry both passengers; the same men operate the train in its intrastate journey and in its interstate journey. Under such conditions the effect of maintaining a materially lower rate intrastate than the reasonable interstate rate necessarily results in intrastate traffic failing to pay a fair proportionate share of the cost, maintenance and operation and is discriminatory against interstate traffic. Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086; State of New York v. United States, 257 U.S. 591, 42 S.Ct. 239, 66 L.Ed. 385; United States v. Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181; State of Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077; Illinois Commerce Commission v. United States, 292 U.S. 474, 54 S.Ct. 783, 78 L.Ed. 1371. The existence of such discrimination against interstate commerce, regardless of the non-existence of any advantage as between persons or localities is sufficient justification for the Commission to end the disparity by ordering it removed.

■ Petitioners contend that existing rates yield sufficient revenue to constitute a reasonable return to the carriers, that the additional revenue from raising the intrastate rates is not necessary, and that the resulting total revenue will be materially more than the carriers are legally entitled to receive. That may be the result, at least temporarily. But the proposed increased rates are not based on the need for additional revenue. The proposed increase is for the purpose of removing an unjust discrimination against interstate commerce which the Commission is empowered to do regardless of resulting increased revenues or the non-existence of any need for the same. It may be that later, after the increase has had time to show its effect, a downward revision of both interstate and intrastate rates will be in order to meet this objection. On the other hand, present large revenues flow from abnormal traffic conditions, clearly only temporary in their nature. With the return to normal conditions, including the resumption of strong competition from trucks and busses, the combined returns may not be unreasonable. Rate making is not confined to a consideration of results from a single calendar year or from a temporary abnormal condition. The Supreme Court recently held that the present bulge of war earnings is unreliable for use

as a standard. Group of Institutional Investors v. Chicago, Milwaukee, St. P. & P. R. Co., 318 U.S. 523, 543, 63 S.Ct. 727, 87 L.Ed. 959. It is approved administrative practice to consider conditions over a reasonable period of years, to strike an average, in determining a basis for rate making. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 46, 47, 56 S.Ct. 720, 80 L.Ed. 1033; South & N. A. R. Co. v. Railroad Commission, D.C., 210 F. 465, 480.

 The Economic Stabilization Director and the Price Administrator contend that in addition to the Commission's failure properly to interpret and· apply its constitutional and statutory authority to protect interstate commerce from undue burdens from intrastate commerce the Commission has failed to accommodate the exercise of its powers to the congressional policies embodied in the Emergency Price Control Act of 1942 and the Stabilization Act of October 2, 1942, and that by reason thereof its order of May 8, 1944, is null and void. This brings into consideration the statutory authority under which these interveners attack the order in question and their standing in the proceedings. Section 302(c) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 942(c), provides:

"Nothing in this Act shall be construed to authorize the regulation of * * * rates charged by any common carrier or other public utility."

Compare Davies Warehouse Co. v. Bowles, 321 U.S. 144, 64 S.Ct. 474. The Emergency Price Control Act was supplemented by the Act of October 2, 1942, which provides:

"That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives 30 days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase." 50 U.S.C.A.Appendix, § 961.

While this language confers upon the executive the right to notice by the utility and requires the utility's consent that the executive be heard by the regulatory body, yet it has been held that in the absence of a clear legislative mandate to the contrary such interveners do not possess any greater rights than other interveners, and that Congress did not intend to limit in any way the existing power of the Interstate Commerce Commission over rate increases, or to give the Price Administrator any standing to make mandatory demands upon it or to take from it any part of its existing discretion. Vinson v. Washington Gas Light Company, 321 U.S. 489, 64 S.Ct. 731; Interstate Commerce Commission et al. v. Jersey City et al., 64 S.Ct. 1129. In the Jersey City case above referred to the Court specifically stated that the opinion of the Price Administrator is not mandatory on the Commission; that the weight to be given to the Price Administrator's contentions called for an exercise of judgment by the Commission and was for the Commission, not for the Court, to determine; that the Interstate Commerce Commission has the responsibility for maintaining an adequate system of wartime transportation, which is a very intricate problem involving many variable factors and calling for informed, expert and unbiased judgment; and that the decision of such a matter by the Commission is clearly not reviewable by the Court because it thinks differently of the weight which should be accorded by some factors in relation to others. In the hearings now under consideration, the Price Administrator was given the required notice and was afforded the opportunity of introducing evidence and of being heard. The report of the Commission refers to his evidence and to his contentions. He has accordingly had the hearing and consideration that the statute provides. He has no standing now in this Court to complain that because his views and contentions were not adopted by the Commission the Commission's order is void and of no effect. His intervention in the three cases presents no additional question to those already discussed.

In our opinion the corrected order of the Interstate Commerce Commission of· May 8, 1944, herein complained of, was within the power of the Commission and properly applied the law to its findings of fact; that these findings of fact are supported by substantial evidence; and that the order is accordingly a valid one which this Court is not authorized to· review any· further than as hereinabove indicated. Accordingly, the injunction prayed for in each case is denied and the respective complaints will be dismissed.